IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANDREW BASH and JOYCE BASH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-cv-240-MEF |
| | ) | |
| MICHAEL PATRICK, *et al.*, | ) | (WO–PUBLISH) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

On May 28, 2007, what began as a routine encounter between a citizen and local law enforcement culminated with the Chief of Police of the Town of Mosses "tasing" Andrew Bash while Joyce Bash brandished both a barstool and a kitchen knife in his defense. In an instant, a reserve police officer who began this encounter unarmed found himself standing with gun-in-hand while the Chief of Police, who was the town's only full time officer, was locked out of the scene. All the while, four children who were inside the house where this all occurred screamed and cried, and thirty or so neighbors congregated to witness the goings on. This climactic scene and the events preceding it resulted in the action presently before the Court.

Plaintiff Andrew Bash claims the acts of the Chief of Police constitute unconstitutionally excessive force and involved an unconstitutional seizure of him in his

1

home.  He also claims these acts are torts under the common law of the State of Alabama. Plaintiff Joyce Bash claims the Chief of Police maliciously prosecuted her after she reported his conduct to the Mayor.  Finally, they claim that the Town of Mosses is responsible for these alleged wrongs because the principle officer involved is the Chief of Police.

Defendants moved for summary judgment on Plaintiffs' claims, and the Motion is under submission and ripe for disposition.  Because the defendants are entitled to qualified immunity, and because the conduct alleged was not the result of a policy, practice, or custom of the City of Mosses, their Motion is due to be granted.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 & 1367 because Plaintiffs' claims are pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the state common law torts of assault, battery, and trespass.  The parties do not contest venue and personal jurisdiction, and the Court finds a sufficient basis for each.

## III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.  Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in

the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  After the nonmoving party has

responded to the motion for summary judgment, the Court must grant summary judgment if

there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law.  Fed.  R. Civ.  P. 56(c).

## IV. FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all documents submitted in support of and in

opposition to the Motion.  The submissions of the parties, viewed in the light most favorable

to the nonmoving party, establish the following relevant facts:

On May 28, 2007, Andrew Bash ("Andrew"), who receives medical treatment for

paranoid schizophrenia, depression, and borderline mental functioning, drove to downtown

Mosses to shop in the Big Store, which is owned by Rebecca Young ("Young").  He left his

car door open while he was in the store, and people in nearby businesses could hear  music

coming from his car stereo.  Andrew and Young talked while they did business and decided

it would not be wise for Andrew to play his music too loudly, as they knew the Chief of

Police, Michael Patrick ("Officer Patrick"), was in the area.  Andrew bid Young farewell and

returned to his car to begin the short drive home.

About the same time, Officer Patrick and Darryl Taunton ("Officer Taunton"), a

reserve Mosses police officer, were patrolling Main Street.  They observed Andrew or his

car and noted what they perceived to be a violation of the city's noise ordinance.  They

circled around and activated their siren and lights.  Instead of stopping immediately, Andrew

proceeded the approximately one mile to his house at 1780 Main Street and pulled into his driveway.  He  did not exceed the posted speed limit during the pursuit.  Things went awry after Andrew stopped the car and exited it.

Accounts differ about exactly what Andrew said when he exited the car.  Andrew claims that he jumped out of the car and told Officer Patrick to hold on, he was coming to talk to him, but first he was going to give his wife, who was inside the house, the keys.  Joyce Bash ("Joyce"), who is married to Andrew, corroborates Andrew's version of events and adds that she heard Andrew asking Officer Patrick why he stopped him.  Officer Patrick claims that when Andrew exited the car he told Andrew that he needed to see his driver's license.  Andrew replied that he was not going to give Officer Patrick a damn thing and dashed for the house.  Officer Taunton corroborates Officer Patrick's version of events.  Other onlookers claim the first thing Officer Patrick said to Andrew was "you're going to jail" and that in response Andrew asked why that was so.

Regardless of exactly what was said, after the brief exchange, Officers Patrick and Taunton pursued Andrew into the house.  Once inside the house, Officer Patrick immediately pounced upon Andrew and began beating him with his fists and attempting to restrain him. Officer Patrick then drew his Taser and "tased" Andrew.  In response, Joyce raised a barstool and threatened Officer Patrick with it while pleading with him to not tase Andrew again. When Officer Patrick responded that he was, in fact, going to tase Andrew again, Joyce set down the stool and picked up a kitchen knife.  Officer Patrick responded by laying the Taser

5

on the kitchen counter and drawing his service weapon.  At this point, Andrew bit Officer Patrick's thumb, distracting him and providing an opportunity for Joyce to throw the Taser through the open door.  Officer Patrick handed his service weapon to Officer Taunton and went to retrieve the Taser. Once he was outside, Joyce locked the door so that she, Andrew, and Officer Taunton were inside the house with the four children Joyce had been watching and Officer Patrick was outside the house with the crowd that had gathered.  Officer Patrick considered this to be a potentially deadly situation and radioed for backup from the Lowndes County Sheriff's Department. Meanwhile, the situation inside was becoming more calm as Officer Taunton managed to talk Andrew into being handcuffed and helped him put on socks and shoes.  Officer Patrick, still fearing the situation, re-entered the house by breaking the glass in the door Joyce had locked behind him and unlocking it from the outside.  The Officers placed Andrew under arrest.  While he was walking to the Police cruiser, Officer Patrick called Andrew "boy" and "nigger" and started laughing.[1]

Officers Patrick and Taunton transported Andrew to the Lowndes County Detention Facility, but officials there refused to place him in custody because he was injured, frantic, and delusional.  Officer Patrick then called an ambulance, which reported to the scene but would not take Andrew because he was dangerous unless placed in a straight jacket and leg

---

[1]Andrew is African-American and Officer Patrick is Caucasian.  These statements were in keeping with Officer Patrick's reputation among African-Americans in Mosses for "tasing . . . black people."

irons, which the Officers were unable to do.[2]  Officer Patrick decided to release Andrew to the custody of his family.

While these events were unfolding at the Lowndes County Detention Facility, Officer Patrick approached Santauisha McGuire, who is Andrew's sister, with an offer.  Officer Patrick told her that he would replace the door that he kicked in and destroyed and that, because he had some time before he had to file charges, if the Bashes did not complain about his conduct he would not charge them with a crime. The portion of this alleged proposal regarding the door is corroborated by the testimony of Mary Hester, the City Clerk.  All of this occurred on May 28, 2007.

On June 4, 2007, Joyce filed a letter of complaint with the mayor of Mosses.

On June 12, 2007, Officer Patrick filed criminal complaints against Andrew for assault and resisting arrest.  On June 19, 2007, Officer Taunton swore out a warrant against Joyce for menacing.  On July 3, 2007, Officer Patrick issued traffic citations to Andrew for driving without a license, violating a noise ordinance, and eluding police.  The District Court of Lowndes County subsequently dismissed the charges when Officer Patrick failed to appear.

Plaintiffs subsequently filed the complaint in this case on April 1, 2008. (Doc. # 1.) In it, they set out many of the facts above and state their claims in six counts.  The first three seek vindication of rights remediable through that well-worn guardian against government

---

[2]The officers had neither a straight jacket nor leg irons.  Officials at the Lowndes County Detention Facility would not loan them leg irons, and no straight jacket was available.

7

malfeasance, 28 U.S.C. § 1983.  These three counts seek redress for "illegal entry," excessive force, and false arrest/malicious prosecution of Joyce, all in violation of the Fourth Amendment to the United States Constitution.  Counts four through six assert state law claims of trespass, assault and battery, and municipal liability.[3]  Each count names Officers Patrick and Taunton in their individual capacities.  The City of Mosses is also a defendant to each count.

Defendants in their answer denied that the rights of Plaintiffs were violated. They filed a Motion for Summary Judgment on January 8, 2009 (Doc. # 23), which is now under submission and ripe for disposition.  For the reasons set forth in this Memorandum and Order, Defendants' Motion is due to be granted.

## V. DISCUSSION

### A. Constitutional Claims

### 1. Qualified Immunity: General Principles

Qualified immunity protects government officers sued in their individual capacities from liability for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The purpose of this immunity is to allow government officials to carry

---

[3]Both the assault and battery and municipal liability claims are denominated "Count V" in the complaint, but they are clearly intended to be separate counts and the Court considers their labeling in this fashion to be a typographical error.  The municipal liability claim will for all purposes be treated as Count VI.

out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).  The inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotation marks omitted); *see Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  (internal quotation marks omitted)).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194 (internal quotation marks omitted).  In making this determination, instead of focusing on whether the acts in question involved the exercise of actual discretion, a court should assess whether they are of a type that fell within the employee's job responsibilities. *O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004).  A court should ask "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize . . . ." *Id.*  Here, it is clear that the Officers were acting within the course and scope of their discretionary authority when they attempted to pull Andrew over, when they pursued him into the house, and when they attempted to arrest him.  Plaintiffs admit as much. (Doc. # 29

9

16) ("It is undisputed that the defendants were acting within the scope of their discretionary authority in their conduct toward plaintiffs."); *see also Lee*, 284 F.3d at 1194 (holding that there was "no doubt" that an officer who pulled over a suspect for a traffic offense and then arrested her was acting within the scope of his discretionary authority); *Vinyard*, 311 F.3d at 1346-47 (holding that an officer was acting within the scope of his discretionary authority when he arrested a subject and transported him to jail); *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1568 (11th Cir. 1992) *vacated on other grounds*, 982 F.2d 472 (11th Cir. 1993) ("It is axiomatic that a law enforcement officer has the discretionary authority to pursue and apprehend a fleeing suspected offender."); *see also Denmark v. Lee County*, 931 F. Supp. 2d 831, 835 (M.D. Fla. 1996) (same); *Edge v. Ferrell*, No. 06-0710-WS-C, 2008 WL 942038, * 6 (S.D. Ala. April 7, 2008) (same).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard*, 311 F.3d at 1346. It was the case until very recently that at this point the court should follow the so-called *Saucier* procedure. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). *Saucier* mandated a two-step sequence for resolving government officials' qualified immunity claims. Courts were to first determine "whether the plaintiff's allegations, if true, establish[ed] a constitutional violation." *Hope*, 536 U.S. at 736 (citing *Saucier*, 533 U.S. at 201). Only if the allegations satisfied this first step did the court decide whether the right at issue was "clearly

10

established" at the time of defendant's alleged misconduct. *Saucier*, 533 U.S. at 201.[4]
Qualified immunity is applicable unless the officials conduct violated a clearly established
constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A unanimous Supreme Court effected a paradigm shift in the law of qualified
immunity in 2009 when it decided *Pearson v. Callahan*, which held that the *Saucier*
procedure was no longer mandatory. 129 S. Ct. at 818 ("On reconsidering the procedure
required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate,
it should no longer be regarded as mandatory."). This decision allows the judges of the
district courts and courts of appeal to "exercise their sound discretion in deciding which of
the two prongs of the qualified immunity analysis should be addressed first in light of the
circumstances of the particular case at hand." *Id.*

Although *Saucier* is no longer mandatory, it is still often beneficial. *Pearson*, 129 S.
Ct. at 818. There are cases in which restricting decision to the clearly established prong
would not meaningfully conserve judicial resources. *Id.* For example, in some cases "a
discussion of why the relevant facts do not violate clearly established law may make it
apparent that in fact the relevant facts to not make out a constitutional violation at all." *Id.*

The Supreme Court noted, however, that for all its value, *Saucier* carries a price.
Specifically, parties are forced to litigate, and busy district courts are required to decide,

---

[4]Prior to *Saucier*, the Supreme Court's cases held that "the better approach to resolving
cases in which the defense of qualified immunity is raised is to determine first whether the
plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,*
523 U.S. 833, 841, n.5 (1998). Saucier made this "better approach" the only approach.

sometimes difficult constitutional questions when doing so is unnecessary. *Id.*  For example, "there are cases in which the constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 818.  Similar considerations arise when an issue is soon to be resolved by a higher court. *Id.*  The Supreme Court also described numerous other reasons to allow district courts to opt out of the *Saucier* procedure, including (1) the dubious value of some decisions under the first prong for resolving difficult constitutional questions, (2) the presence in the case of uncertain questions of state law that may affect the resolution of constitutional issues, (3) an insufficiently developed factual record at the motion to dismiss stage, when qualified immunity is often raised, (4) and the risk of bad decisionmaking in the lower courts where constitutional questions are often not well-briefed. *Id.* at 819-20.  In these and other cases "in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all," courts are now free to do what is natural and decide the case on the easier basis. *See id.* (noting that oftentimes this is the order in which Judges reason to a conclusion about a case and that *Saucier* should not artificially obstruct decisionmaking).

The Supreme Court dismissed arguments that this additional point of decision would lead to additional litigation on the issue of whether a particular case justifies reaching the merits.  In this case, at least, the Court finds the decision easy: it will not apply the *Saucier* procedure. Plaintiffs' constitutional claims fall into one of two categories: "ones in

which the constitutional right is not clearly established but far from obvious whether in fact there is such a right as far as the constitutional issues are concerned," or ones in which "a discussion of why the relevant facts do not violate clearly established law . . . make it apparent that in fact the relevant facts to not make out a constitutional violation at all." *Id.* at 819-20.  In order to avoid the risk of "bad decisionmaking" or an opinion of "dubious value" the Court will not follow the *Saucier* procedure in this case. *Id.* Therefore, the Court will begin by deciding whether each of Plaintiffs' claims and the evidence offered to support them make out a violation of a clearly established constitutional right.

### 2. Clearly Established Rights

In order to determine whether an officer's conduct violates a clearly established constitutional right, a court must do more than just compare the facts of the instant case to prior cases to determine if a right is clearly established; it must also assess whether the facts of the instant case fall within statements of general principle found in appropriate precedent. *See, e.g.*, *Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates law even in novel factual circumstances.  Indeed, in *[United States v.] Lanier* [, 520 U.S. 259 (1997)], we expressly rejected a requirement that previous cases be 'fundamentally similar.'"); *Holloman,* 370 F.3d 1252, 1278 (11th Cir. 2004); *Vinyard,* 311 F.3d at 1351. The "salient question . . . is whether the state of the law...gave [the officers] *fair warning* that their alleged treatment [of the plaintiff] was unconstitutional." *Hope,* 536 U.S. at 741.

Officials sued pursuant to § 1983 thus have a right to fair notice. *Id.* at 739.  This

notice can be given in three ways.  *Vinyard*, 311 F.3d at 1350-53.  First, the words of the federal statute or constitutional provision may in themselves be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law.  *Id.* at 1350.  Second, preexisting case law may serve to provide fair notice.  *Id.* at 1351.  Case law need not arise out of factually identical situations to clearly establish law for purposes of the qualified immunity analysis.  *Id.* at 1351.  Broad legal principles established in case law may serve to clearly establish the law even for cases arising out of factually different situations.  *Id.*  Third, in the absence of case law with a broad holding sufficient to provide fair notice, fact specific precedents may serve to clearly establish the law arising out of martially similar factual circumstances.  *Id.* at 1351-52.

### a. Excessive Force

The Eleventh Circuit has previously found in some cases that the Fourth Amendment itself is sufficiently clear to establish that certain conduct violates the protections of that provision.  Specifically, it has sometimes found violations of the Fourth Amendment in excessive force cases involving conduct "far beyond the hazy border between excessive and acceptable force" even in the absence of prior case law.  *Vinyard*, 311 F.3d at 1350 n.18.  Cases in which the language of the Fourth Amendment itself has been sufficient to put the officer on notice that his conduct  was in violation of the law appear to be cases involving the use of significant force after an arrestee has been subdued.  *Id.*  For example, beating a

14

suspect, kicking a suspect, or slamming the head of a suspect the ground is conduct which deprives the law enforcement officers of qualified immunity when the suspect was handcuffed and did not struggle or resist the officers in any way and did not attempt to flee. *Slicker v. Jackson,* 215 F.3d 1225, 1232-33 (11th Cir. 2000). The conduct in this case is not so egregious that the text of the Amendment itself clearly establishes its unconstitutionality and the proposition that persons are to be free from "unreasonable searches and seizures" is not sufficient to put the officers on notice that their conduct in this case was unconstitutional. The Court therefore turns to case law interpreting the amendment to determine whether they clearly establish the unconstitutionality of the conduct in this case.

Plaintiffs cite no binding Fourth Amendment case, and this court has located none, in which conduct "materially similar" that in issue here was held unconstitutional. *See Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003) (discussing "materially similar" concept). In fact, the closest cases stand for the opposite proposition, though the force in those cases resulted from more provocative acts by the plaintiffs than occurred here. *See, e.g.*, *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (holding that "in a 'difficult, tense and uncertain situation,' the use of a taser gun to subdue a subject who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force."); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (same).

Plaintiffs must therefore show that the broad legal principles set out in prior cases serve to clearly establish the law in this case, even though it arises from facts different from those prior cases. This requires the Court to draw upon the general principles applicable to

15

excessive force claims to determine whether every reasonable officer would conclude that the conduct of which Plaintiffs complain was unconstitutional.

When a plaintiff claims that a law enforcement officer has used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure of a free citizen, courts must analyze those claims under the Fourth Amendment and its "reasonableness" standard. *Grahm v. Connor*, 490 U.S. 386, 395 (1989); *Handley v. Guitierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* The calculus of reasonableness must embody an allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. Thus, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* (citing *Scott v. U.S.*, 436 U.S. 128, 137-139 (1978)); *Zivojinovich*, 525 F.3d at 1072.

Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Id.* Because "[t]he test of reasonableness under the Fourth Amendment is

not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), its proper application requires careful attention to the facts and circumstances of each particular case.   *See Grahm*, 490 U.S. 395. A court in the Eleventh Circuit determining whether an officer's use of force was reasonable, thereby entitling the officer to qualified immunity, should consider "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Hadley v. Guitierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000));  *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th Cir. 1992) (quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)). A court should also consider "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (citation omitted).

First, the severity of the crime at issue is slight.  In fact, the only crimes that were in play before the kitchen melee were a possible noise ordinance violation and failure to yield to law enforcement.  Second, however, from the perspective of a reasonable officer on the scene, Andrew plausibly posed an immediate threat to the safety of the officers or others. Initially, the subject's decision to enter the house in contravention to the officer's orders carried the potential that the subject would retrieve a weapon or would hold up in the house. Once the officers entered the residence the situation inside the house was undeniably tense and potentially dangerous.  Everyone in the residence, including the four children, were in

a highly agitated state, Joyce was wielding a barstool then a kitchen knife, and Andrew at the very least needed to be calmed down, according to Joyce's testimony.  Third, though he denies nefarious intent, from the perspective of the pursuing officers it reasonably appeared that Andrew was attempting to evade arrest by flight when he refused to pull over despite Officer Patrick's sirens and blue lights.  Therefore, given the speed with which this situation escalated from  a routine traffic stop to an in-home two-on-two brawl involving a barstool, a knife, a taser, a service weapon, four children, and a crowd of onlookers, it cannot be said that the force employed by Officer Patrick was so outside of what the constitution allows in such circumstances that it should have been readily apparent to him that his acts were unconstitutional or that every reasonable officer would determine that the amount of force he employed was unconstitutional.[5]   Even in the peace and relative solitude of this Court's chambers, this conduct is at most of questionable constitutionality. *See Post*, 7 F.3d at 1559.

Furthermore, a reasonable officer considering the four numbered factors above could have concluded that the force applied was not unconstitutionally excessive.  First, a reasonable officer could have determined that force was needed.  Andrew fled into the house in apparent defiance of an officer's orders after failing to stop when prompted by siren and

---

[5]The Court is aware that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force. *See Hadley*, 526 F.3d at 1329.  For example, in *Slicker*, 215 F.3d at 1233, the Eleventh Circuit held that, where a Plaintiff had not struggled or resisted in any way and was handcuffed but officers kicked him and beat his head on the ground anyway, the beating was constitutionally excessive force.  This case is different, though.  The force began after the subject refused to stop and then fled into a house and Andrew admits Officer Patrick did not hit him once he was restrained.  These cases do not clearly establish a constitutional right that was violated here.

lights. Second, a reasonable officer could think the amount of force that caused these injuries was proportionate to the need for force under the circumstances. Third, the extent of the injury was slight.  Andrew testified that he was not hurt badly enough to need medical treatment on the day of the incident and only went to the hospital at the urging of his mental health worker.  The only injuries he complained of were at the site of the taser shock and a sore ankle. Finally, there is some indication that the application of force was done maliciously or sadistically because of Officer Patrick's use of the terms "boy" and "nigger" and Andrew's claim that Officer Patrick had a reputation for "tasing us black people." In light of the totality of the circumstances, and because ultimately the question is whether the officers' actions are "objectively reasonable" without regard to their underlying intent or motivation, *Handley*, 526 F.3d at 1329, the Court cannot say that every reasonable officer would determine the force applied in this case to be unconstitutionally excessive.

Because Officer Patrick did not violate the clearly established constitutional rights of Andrew, the officers are entitled to qualified immunity and their Motion is due to be granted as to Count II.[6]  Today is not the "rare" day that qualified immunity will fail to shield a law enforcement officer from liability for claims of excessive force when there is no binding caselaw on point. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1280 n.10 (11th Cir.

---

[6]Plaintiffs argue that it is clearly established that "[p]olice use of excessive force is a constructional violation under th Fourth Amendment."  (Doc. # 29 10.)  This argument is without merit because "a reasonable officer's awareness of the existence of an abstract right, such as a right to be free from excessive force . . . , does not equate to knowledge that his conduct infringes the right." *Jackson v. Sauls*, 206 F.3d 156, 1165 (11th Cir. 2000).

2002);[7] *see also Willingham*, 321 F.3d at 1303 ("preexisting, factually similar cases are—not always, but (in our experience) usually—needed to demonstrate that officials were fairly warned that their application of force violated the victim's constitutional rights.").

### b. Unlawful Entry

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  This amendment protects the sanctity of one's person, house, papers, and effects against uninvited and warrantless intrusions by government actors, but "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *U.S. v. U.S. Dist. Court for the E. Dist. of Mich., So. Division*, 407 U.S. 297, 313 (1972); *see also Silverman v. U.S.*, 365 U.S. 505 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *but see U.S. v. Santana*, 427 U.S. 38, 43 (1976) (holding that the act of retreating into the home could not thwart an otherwise proper

---

[7]Plaintiffs argue that Officer Taunton had an obligation to protect Andrew from Officer Patrick's use of excessive force. *See Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under Section 1983.  Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.")  Though this provision for nonfeasance liability is narrower than Plaintiffs urge, this derivative theory cannot support liability when there was no underlying use of excessive force. *See id.*  Therefore, Defendants' Motion is due to be granted to the extent it seeks dismissal of the excessive force claims against Officer Taunton.

arrest when the arresting officers in hot pursuit had probable cause to believe the subject committed a crime and entered the house).  The most operative word in the amendment is, however, "unreasonable."  Only those home entries that are constitutionally unreasonable violate the amendment, and so the amendment does not proscribe constitutionally reasonable entries into the home.  This truth has led to a rich body of caselaw that delineates the border between reasonable and unreasonable.

Because of the special concern for the sanctity of the home embodied by the amendment, "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).   The Supreme Court has crafted a few carefully drawn exceptions to the warrant requirement to cover situations where "the public interest require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search." *U.S. v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979)). One such exception is that the police may enter a private premises and conduct a search if "exigent circumstances" mandate immediate action. *Id.* This exception encompass situations when a warrant is not feasible or advisable, "such as hot pursuit of a subject, risk of removal or destruction of evidence, and danger to the arresting officers or the public." *Id.*; *U.S. v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986).[8]

_____

[8]Even when exigent circumstances exist, a warrantless search generally must be supported by probable cause. *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985); *U.S. v. Santa*, 236

The entry by Officers Patrick and Taunton into the Bash home was not a violation of a clearly established constitutional right because a reasonable officer on the scene could have thought the entry fell within the hot pursuit exception described above. Hot pursuit describes a situation in which police are pursuing a suspect who is in the process of fleeing from a recently committed crime. *See Warden v. Hayden*, 387 U.S. 294, 294-310 (1967) (establishing the hot pursuit exception). Officers Patrick and Taunton were quite clearly in hot pursuit, but Plaintiffs offer several arguments why the fact of hot pursuit, together with probable cause of the noise ordinance and attempting to evade police, do not suffice to render the entry reasonable.[9]

First, Plaintiffs argue that the pursuit here occurred within the posted speed limits and was over a relatively short distance. The law of hot pursuit, however, provides that hot

_____

F.3d 662, 668-69 (11th Cir. 2000) ("A warrantless search is allowed, however, where both probable cause and exigent circumstances exist."). However, "[a]ll that is required for qualified immunity to be applicable to an arresting officer is *arguable* probable cause to believe that a person is committing a particular public offense." *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (per curiam) (citations and quotations omitted) (emphasis added). Arguable probable cause exists where "'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." *Id.* The Court is satisfied that, at the very least, arguable probable cause was present here.

[9]In addition to the two primary arguments addressed in the two following paragraphs by the Court, Plaintiffs argue that there was no evidence that Andrew was a danger to the public or to the pursuing officers because the underlying offense for which he was being pursued was nonviolent. Plaintiffs also argue that there was no reason for the officers to believe that Andrew would destroy evidence. If these were the reasons offered for the warrantless entry these arguments might hold water. However, hot pursuit is the most obvious explanation and the one in fact offered by Defendants. This fact renders these arguments unpersuasive. *See Edmondson*, 791 F.2d at 1515 (holding that "hot pursuit of a subject, risk of removal or destruction of evidence, and danger to the arresting officers or the public" can each alone create exigent circumstances).

22

pursuit simply means "some sort of chase" and that it "need not be an extended hue and cry 'in and about the public streets'" *Santana*, 427 U.S. at 42; *see also U.S. v. Ramos*, 933 F.2d 968 (11th Cir. 1991) (noting that, even though a chase ended almost as soon as it began, it was nonetheless properly characterized as a hot pursuit).

Second, they argue that the underlying crime for which there was probable cause was relatively minor.  The Court is mindful that the exigent circumstances exception should be used with great caution when the effect is to validate a warrantless entry into a person's home when, in cases like this one, the underlying offense is minor (a misdemeanor). *See Welsh v. Wisconsin*, 466 U.S. 740 (1984).  There are few cases that decide whether the entry of a residence incident to a hot pursuit of a subject the pursuing officers have probable cause to believe committed a minor or traffic violation, such as is the case here. What few cases there are predominantly support the constitutionality of the home entry in this case. *See Griffin v. City of Clanton, Ala.*, 932 F. Supp. 1359 (M.D. Ala. 1996) (Albritton, J.) (holding that police did not violate a suspect's Fourth Amendment rights when search of home followed foot pursuit of suspect of traffic-related offenses); *St. Laurent v. Town of Sturbridge*, Civ. A. No. 89-30005-F, 1990 WL 92470 (D. Mass. June 18, 1990) (holding that warrantless search of residence was justified when a police officer attempted to pull over a subject because he was driving erratically but the plaintiff did not stop until he was at the entrance to his own driveway, and when the officer approached the plaintiff's parked truck and instructed him to get out, telling him that he was under arrest for driving under the influence, the plaintiff "said something" to the policeman, rolled up his window, drove up his driveway to his house

and went inside, leaving the officer standing at the end of the driveway).  The Court has considered this in light of all of the circumstances and found it to be insufficient to render the search or seizure a violation of a clearly established constitutional right.

The Court is cognizant of the function of the exigent circumstances exception: to allow searches and seizures "when there is a compelling need for official action and no time to secure a warrant." *Holloway*, 290 F.3d at 1334.  Nevertheless, the Court has determined that the pursuit of Andrew across the threshold of his home was not a violation of a clearly established constitutional right sufficient to overcome qualified immunity.[10]  Therefore, Defendants' Motion is due to be granted insofar as it seeks dismissal of Count I.

### c. Malicious Prosecution

Count III of the Complaint seeks redress for the false arrest or malicious prosecution of Joyce Bash.[11]  Specifically, the Count alleges that Officers Patrick and Taunton initiated

---

[10]The Court expresses no opinion on the ultimate constitutionality of such a search or seizure.

[11]There is some ambiguity in whether Count III attempts to make out a state law tort claim for malicious prosecution or a § 1983 claim for malicious prosecution in violation of the Fourth Amendment.  The heading of that Count reads: "42 U.S.C. § 1983 False Arrest / Malicious Prosecution – Joyce." (Doc. # 1 6.)  There is no specific allegation in this Count, however, that Joyce Bash was subjected to a constitutionally unreasonable seizure, as is necessary to make out a claim for malicious prosecution in violation of the Fourth Amendment. *Wood v. Kesler*, 323 F.3d 872, 881-82 (11th Cir. 2003) (noting that malicious prosecution claims brought pursuant to the Fourth Amendment require the plaintiff prove "a violation of h[er] right to be free from unreasonable seizures, in addition to the common law tort of malicious prosecution.").  Moreover, Plaintiffs in their response to Defendants' Motion treat the claim as one for malicious prosecution in violation of state common law (Defendants in their Motion treat the claim as a constitutional one).

As detailed above, a plaintiff seeking to prove a malicious prosecution in violation of the Fourth Amendment must prove the elements of the state common law tort of malicious prosecution.  Joyce Bash's claim does not satisfy the elements of the state common law tort of

a criminal proceeding against Joyce in retaliation for Joyce's filing of a letter of complaint and absent probable cause.  The malicious prosecution claim is brought pursuant to the Fourth Amendment, in which case the plaintiff must prove "a violation of h[er] right to be free from unreasonable seizures, in addition to the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881-82 (11th Cir. 2003). The elements of the common law tort of malicious prosecution in Alabama are "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id.* at 882 (citing *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 831-32 (Ala. 1999)). Because the facts, when viewed in the light most favorable to the Plaintiffs, do not establish absence of probable cause, Defendants are entitled to qualified immunity and their Motion is due to be granted with respect to Count III.

Plaintiffs' malicious prosecution claim fails for two reasons.  First, the facts to not evince an unconstitutional seizure of Joyce by Officers Patrick and Taunton.  As stated above, a claim for malicious prosecution in violation of the Fourth Amendment under § 1983 requires proof of a violation of the Plaintiffs' right to be free from unreasonable seizures. *Wood*, 323 F.3d at 881-82.  Second—and this would be a problem for a state law claim for malicious prosecution as well—Defendants unquestionably had probable cause to swear out

---

malicious prosecution because there was probable cause.  Therefore, to the extent Count III is one for the state common law tort of malicious prosecution, it is due to be dismissed.

a warrant for Plaintiff Joyce Bash's arrest for menacing.[12]   A person commits the crime of

menacing in Alabama "if,  if, by physical action, he intentionally places or attempts to place

another person in fear of imminent serious physical injury." Ala. Code § 13A-6-23(a).

Alabama law defines probable cause as a reasonable ground for suspicion, supported by

circumstances sufficiently strong in themselves to warrant a cautious man in the belief that

a person accused is guilty fo the offense charged. *S.S. Kresge Co. v. Ruby*, 348 So. 2d 484,

488 (Ala. 1977); *see also Wood*, 323 F.3d at 878.   By Joyce Bash's own testimony she

threatened Officer Patrick with a barstool before brandishing a kitchen knife and threatening

the officers with it.   Threatening another first with a blunt object and then a with sharp one

is a paradigmatic example of placing or attempting to place another person in fear of

imminent serious physical injury.[13]   Because Officers Patrick and Taunton had actual

---

[12] "All that is required for qualified immunity to be applicable to an arresting officer is
arguable probable cause to believe that a person is committing a particular public offense."
*Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (per curiam) (citations and
quotations omitted).  Arguable probable cause exists where 'reasonable officers in the same
circumstances and possessing the same knowledge as the Defendants could have believed that
probable cause existed to arrest' the plaintiffs." *Id.* After examining the undisputed facts, the
Court finds that Officers Patrick and Taunton has actual probable cause, which would also cause
a state law claim for malicious prosecution to fail. *See supra* note 10.  The Court also notes that
arguable probable cause would afford the officers discretionary function immunity under *Borders
v. City of Huntsville*, 875 So. 2d 1168 (Ala. 2003), which would shield them from liability for the
state common law tort of malicious prosecution.

[13] Plaintiffs point primarily to the quid pro quo allegedly proposed to Andrew's sister by
Officer Patrick.  If true, this would certainly support the proposition that the prosecution of Joyce
was "with malice."  However, a successful malicious prosecution claim in Alabama requires that
the prosecution be "with malice and *without probable cause.*" *Wood*, 323 F.3d at 882.
Hence, even where there is malice, if there is also probable cause a plaintiff has no claim
for malicious prosecution.  Even taking Plaintiffs' evidence of malice as true, the plain
existence of probable cause causes the malicious prosecution claim to fail.

probable cause, Plaintiffs have shown a violation of neither state tort law nor the Fourth Amendment, and the officers are entitled to qualified immunity. Their Motion is therefore due to be granted to the extent it seeks dismissal of Count III.

### B. Municipal Liability

Plaintiffs also named the City of Mosses as a Defendant to this action, but Defendants argue that there is no custom, policy, or practice that caused the alleged violations. As the Supreme Court held in *Monell v. Department of Social Services*, 436 U.S. 658, 691-92 (1978), "a municipality cannot be held liable *solely* because it employs a tortfeasor. . . . Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 691, 694.

The City of Mosses is not liable for Plaintiffs' injuries for two reasons. First, and most principally, as detailed in the preceding sections, Plaintiffs have presented no injuries remediable through § 1983 so there is no violation caused by any policy or custom. Second, the record is completely devoid of evidence regarding the customs or policies of the City of Mosses. Plaintiffs argue that, because Officer Patrick is the Chief of Police, he is one "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *see also Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (defining "policy" as a "decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality"). However, as the Supreme Court has made clear "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell.*" *City of Oklahoma*

27

*City v. Tuttle*, 471 U.S. 808, 823 (1985); *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1330 n.6 (11th Cir. 2003) (*en banc*).  Here, even assuming the facts make out a constitutional violation, there is but proof of this one incident, which cannot, by itself, establish a custom, policy, or practice. Therefore, the City of Mosses would not be liable for the alleged injuries even if they were remediable.  As such, Defendants' Motion is due to be granted to the extent is seeks dismissal of all claims against the City of Mosses.

### C. State Law Claims

Plaintiffs bring a number of claims pursuant to Alabama law in addition to their claims pursuant to 42 U.S.C. § 1983.  This Court has supplemental subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367.  The statutory provision addressing supplemental jurisdiction provides that

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Thus, § 1367(a) provides a basis for this Court to exercise jurisdiction over Plaintiffs' claims pursuant to Alabama law because it has jurisdiction over their claims pursuant to 42 U.S.C. § 1983.  However, the requirement contained in § 1367(a) that this Court exercise its supplemental jurisdiction over Plaintiffs' state law claims is subject to certain enumerated instances in which it is appropriate for a federal court to decline to

exercise its supplemental jurisdiction over a case.  Those circumstances are set forth in §

1367(c), which provides that

> The district courts may decline to exercise supplemental jurisdiction
> over a claim under subsection (a) if –
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over
> which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original
> jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for
> declining jurisdiction.

28 U.S.C. § 1367(c).  The federal claims over which this Court had original jurisdiction have

now been resolved against Plaintiffs.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines

to exercise supplemental jurisdiction over Plaintiffs' claims pursuant to Alabama law.   All

of Plaintiffs' claims pursuant to Alabama law are accordingly due to be dismissed without

prejudice.  This dismissal should not work to Plaintiffs' disadvantage should they elect to

bring suit in state court because the period of limitations for any of these claims is tolled

during the pendency of this action.  *See* 28 U.S.C. § 1367(d).

## VI. CONCLUSION

The Court is not unsympathetic to the claims of Andrew and Joyce Bash. The law,

however, provides broad immunity to law enforcement officers in order to protect their

ability to carry out their law enforcement duties free from fear of personal liability except in

cases of plain incompetence and willful constitutional violations.  Therefore, for the reasons

set forth above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. # 23) is GRANTED.  All claims against Defendants are DISMISSED with prejudice, except that Plaintiffs' state law claims are DISMISSED without prejudice.

Done this the 9th day of April, 2009.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE